## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JEREMIAH MCCALL,                        *

    Plaintiff,                          *

                                    *

v.                                      *

                                    *          Civil No. 22-357-BAH
DEAN ROUNDS, JR., ET AL.,

                                    *

    Defendants.                         *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff Jeremiah McCall ("Plaintiff") brought suit against multiple employees of the Maryland Department of Public Safety and Correctional Services ("DPSCS"), including in their individual capacities Officer Dean Rounds, Jr. ("Rounds"), Officer Jeremy Wolford ("Wolford"), Sergeant Anthony Koelker ("Koelker"), Office Christopher Vinci ("Vinci"), Office David Spence ("Spence"), Office Roman Yoder ("Yoder"), Officer John Doe ("Doe"),[1] Lieutenant Jeremy Crites ("Crites"), Sergeant Smith ("Smith"), Officer Cody Gilpin ("Gilpin"), Captain Janet Puffenbarger ("Puffenbarger"), Officer M. Sherbin ("Sherbin"), Officer J. Hearn ("Hearn"), and Officer Brian Mallery ("Mallery"), and, in their individual and official capacities, Assistant Warden Bradley Butler ("AW Butler"), Warden Ronald Weber ("Warden Weber"), and Commissioner J. Philip Morgan ("Commissioner Morgan") (collectively "Defendants"), for federal and state

---

[1] Officer John Doe is an unidentified and unserved defendant, and no defendants move to dismiss claims on his behalf. Accordingly, the Court does not address Plaintiff's claims insofar as they relate to Doe in its ruling on this motion.

constitutional violations and tortious conduct Plaintiff alleges occurred between December 2020 and October 2023. ECF 54 (second amended complaint).[2]

Pending before the Court are two motions: a motion to dismiss or, in the alternative, for summary judgment, on behalf of Rounds, Wolford, AW Butler, Warden Weber, and Commissioner Morgan (collectively the "Supervisory Defendants"), ECF 67, and a motion to dismiss on behalf of Koelker, Vinci, Yoder, Crites, Gilpin, Puffenbarger, Sherbin, Hearn, Mallery, Smith, and Spence (collectively the "Officer Defendants"), ECF 97. Plaintiff filed an omnibus opposition to both motions, ECF 101, to which Defendants Commissioner Morgan, Warden Weber, AW Butler, Loelker, Vinci, Yoder, Crites, Gilpin, Puffenbarger, Sherbin, Hearn, Mallery, Smith, and Spence replied, ECF 106.

For the reasons noted below, the Court will construe the Supervisory Defendants' motion, ECF 67, as a motion to dismiss. *See infra* Section II.C. The Court has reviewed all relevant filings[3] and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for the reasons stated below, Supervisory Defendants' motion is **GRANTED** and Officer Defendants' motion is **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND

### A.    Factual Background

The facts alleged here revolve around three incidents during Plaintiff's incarceration at two Maryland correctional institutions: North Branch Correction Institution ("NBCI"), where Plaintiff was previously incarcerated, and Western Correctional Institution ("WCI"), where Plaintiff was

---

[2] Plaintiff's original complaint is filed at ECF 1 and his first amended complaint is filed at ECF 6.

[3] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

later transferred and where he remains incarcerated today. *See* ECF 54, at 2. The first incident occurred at NBCI on December 21, 2020, *id.* at 3; the second occurred on April 6, 2023, at WCI, *id.* at 28 ¶ 93; and the third occurred on October 27, 2023, also at WCI, *id.* at 31 ¶ 103. The Court reviews factual allegations relevant to each alleged incident in chronological order below.

### 1. December 21, 2020 Incident and Its Aftermath

Plaintiff, alleges that on December 21, 2020, NBCI staff denied him the opportunity to use the phone during "promised phone time." *Id.* at 13 ¶¶ 31–32. As a result, Plaintiff, along with other incarcerated individuals, protested that denial by "keeping their hands in the security slot of their cells, so the slots could not be closed." *Id.* at 13 ¶ 32. Plaintiff alleges that when Koelker saw Plaintiff engaged in this act, Koelker informed Plaintiff that if he kept the security slot open past the completion of the evening medication distribution, Koelker would "whoop [Plaintiff's] ass." *Id.* at 13 ¶ 33.

After the evening medication distribution occurred, Koelker and eight other officers allegedly gathered at Plaintiff's cell, and six officers (Spence, Vinci, Yoder, and Koelker) rushed inside. *Id.* at 14 ¶ 36. Plaintiff alleges that the officers then restrained Plaintiff, twisting his leg in the process, and handcuffed him before removing him from his cell. *Id.* at 14–15 ¶¶ 37–39. Vinci, Spence, Wolford, and Rounds then allegedly escorted and carried Plaintiff to the medical room, inside which there were allegedly no surveillance cameras. *Id.* at 15 ¶¶ 40–42. In that room, Plaintiff alleges that Wolford and Rounds repeatedly punched Plaintiff "in the back of his head, in his facial area, and on his body" while Plaintiff was handcuffed and held face down on the examination table, causing him significant injury. *Id.* at 16–17 ¶¶ 46–50.

After the incident, two nurses allegedly entered the medical room. *Id.* at 20–21 ¶ 64. Despite Plaintiff's requests for the nurses to examine his wounds and provide him with treatment, he alleges that they inaccurately stated he had "refused treatment" and did not provide care to him.

*Id.* One nurse printed Plaintiff's named on a denial-of-care form and stated that Plaintiff refused her medical treatment. *Id.* Shortly thereafter, Plaintiff alleges that Wolford and Rounds brought him to a "strip search cage," where he continued to request medical care. *Id.* at 21 ¶ 65. Eventually, a third nurse was called to evaluate Plaintiff's left eye. *Id.* at 21 ¶¶ 65–66. She noted a laceration and recommended Plaintiff be sent to the hospital, a decision Plaintiff alleges Wolford and Rounds disagreed with. *Id.* at 21 ¶ 66. Eventually taken to the hospital, Plaintiff received a CT scan and was treated for swelling, a small nasal fracture, and the laceration below his left eye, in addition to head and back pain. *Id.* at 21–22 ¶ 67.

In a Request for Administrative Remedies ("ARP") made on January 2, 2021, Plaintiff sought counseling and a psychiatric evaluation due to the alleged assault. *Id.* at 22 ¶ 68. On February 22, 2021, Plaintiff completed applications for statements of charges against Wolford and Rounds, requested temporary restraining orders, and asked to be placed in protective custody. *Id.* at 22 ¶ 69. Plaintiff also alleges that he requested a transfer from NBCI to "a prison outside of the western Maryland region." *Id.* On January 3, 2021, Plaintiff filed an ARP concerning the December 21, 2020 incident, which was "procedurally dismissed as the ARP was under investigation by the DPCSC's Intelligence and Investigative Division." *Id.* at 22 ¶ 71. In the months following the incident, Plaintiff alleges that Vinci, Spence, Wolford, Rounds, and Koelker engaged in a cover up, disposing of evidence related to the assault, misleading the investigator who subsequently investigated the incident, and lying about or omitting information in their written reports about the incident. *Id.* at 17–20 ¶¶ 52–63.

The second amended complaint also contains allegations related to two events following the December 21, 2020 incident involving Gilpin and Crites and Smith, respectively. First, Plaintiff alleges that on February 12, 2021, Gilpin walked into Plaintiff's "housing unit carrying a

4

manila envelope which Gilpin said contained [Plaintiff]'s medical records related to the injuries [Plaintiff] suffered during the December 21, 2020 assault." *Id.* at 23 ¶ 74. Gilpin allegedly made a "high-pitched sound" and "waived the envelope in the air while telling Mr. McCall that he would not receive his medical records unless Mr. McCall dropped his ARP" against Rounds and Wolford. *Id.* at ¶¶ 74–75. Gilpin allegedly told Plaintiff that the sound related to "the KKK," told Plaintiff he was "not afraid of [him]," and used a racial slur directed at Plaintiff. *Id.* Second, Plaintiff alleges that in March 2021, Crites and Smith "attempted to bribe [Plaintiff] into dropping the ARP [Plaintiff] had filed [against Rounds and Wolford] in response to the assault in the Medical Room" by suggesting that they would not charge Plaintiff with a criminal charge arising from an unrelated incident in which Plaintiff allegedly possessed a weapon. *Id.* at 24 ¶ 77–78. Plaintiff refused to drop the ARP and, on June 8, 2021, was charged with "possession of a weapon" in state court. *Id.* at ¶ 78.

### 2. The April 6, 2023 Incident

In March 2023, after a brief stint at Jessup Correctional Institution, Plaintiff was transferred to WCI, "which is adjacent to and across the street from NBCI." *Id.* at 25–26 ¶¶ 83–85. At the time of transfer, Plaintiff "believed that some officers who worked at" NBCI or WCI "had family members who worked at the other institution," and that "many of the officers who worked at NBCI and WCI were friends and socialized together" or had worked at both institutions. *Id.* at 26 ¶ 87. Consequently, upon arriving at WCI, Plaintiff met with Puffenbarger to express his concern about being housed in the general population for fear that "he would face retaliation by WCI staff or inmates because he had filed a lawsuit against Defendant Rounds and Wolford." *Id.* at 26–27 ¶¶ 88–89. Plaintiff alleges that Puffenbarger "had previously served as a correctional officer at NBCI" and told Plaintiff that she "remembered him from [a] prior NBCI incarceration." *Id.* at 27 ¶ 89. Plaintiff alleges that he "requested that he not be placed in the WCI general population and

5

instead requested that he be placed in protective custody." *Id.* at 27 ¶ 89. Puffenbarger refused Plaintiff's request, allegedly telling him "you're going to gen pop or you're going to lock-up." *Id.* at 27 ¶ 89. On March 8, 2023, Plaintiff submitted an ARP concerning Puffenbarger's refusal to transfer Plaintiff to protective custody. *Id.* at 27 ¶ 90. Plaintiff refused the assignment and was placed on a short disciplinary segregation. *Id.* at 28 ¶ 91. He was ultimately placed in the WCI general population on March 12, 2023. *Id.* at 28 ¶ 92.

On April 6, 2023, Plaintiff alleges a "member of Dead Men Incorporated ('DMI')," a prison gang, attacked Plaintiff with a knife in a WCI bathroom in the general population unit while another inmate stood guard. *Id.* at 28 ¶¶ 93–94. Plaintiff was stabbed at least five times and slashed on various parts of his body. *Id.* at ¶ 93. Plaintiff alleges that "some DMI members espouse a white supremacist ideology." *Id.* After the attack, Plaintiff was placed in administrative segregation. *Id.* at ¶ 96. On April 22, 2023, Plaintiff filed another ARP concerning Puffenbarger's refusal to house him apart from the general population at WCI, and Plaintiff requested a transfer to Patuxent Institution. *Id.* at 29 ¶ 98. Plaintiff alleges that on May 2, 2023, AW Butler dismissed one of Plaintiff's ARPs. *Id.* at 29 ¶ 99. On May 29, 2023, Plaintiff submitted a third ARP concerning "a pattern of retaliation and coercion by correctional officers . . . between April 17, 2023, and May 23, 2023." *Id.* at 30 ¶ 100. On June 14, 2023, Plaintiff's counsel wrote a letter to Commissioner Morgan, and sent a copy of the letter to Warden Weber, which detailed concerns for Plaintiff's safety and requested his immediate transfer to another correctional institution. *Id.* at 30 ¶ 101. Commissioner Morgan and Warden Weber responded in separate letters rejecting the request to transfer. *Id.*

### 3.    The October 27, 2023 Pepper Spray Incident

Plaintiff alleges that while at WCI, he had no money to call his loved ones and was denied an electronic tablet by which he could otherwise communicate with them. *Id.* at 31 ¶ 102. On

6

October 27, 2023, Plaintiff protested that denial "by placing a portion of a sheet in the cell slot of the door to his cell." *Id.* at 31 ¶ 103. Defendants Mallery, Sherbin, and Hearn attempted to remove the sheet, but Plaintiff "resisted their efforts by allegedly grabbing hold of [] Mallery's arm." *Id.* Sherbin and Hearn then simultaneously discharged cans of pepper spray through Plaintiff's cell slot before immediately closing it, leaving Plaintiff inside of the cell with "a substantial amount of pepper spray." *Id.* According to the second amended complaint, Mallery then went outside of the building and, "without provocation or justification, sprayed more pepper spray into [Plaintiff's] cell through the outside window[.]" *Id.* Plaintiff alleges that he was left "inside the cell for a total of eight minutes and 20 seconds" after the irritant was first sprayed into his cell before officers "opened the cell slot in the door . . . , handcuffed him, and removed him from his cell." *Id.* After the incident, Plaintiff alleges that Mallery drafted a "false written report about the pepper-spray incident," falsely claiming that the pepper spray was used to try to stop Plaintiff from harming himself. *Id.* at 31 ¶ 104. Plaintiff was later charged with "second degree assault" for allegedly grabbing Mallery's wrist in the October 27, 2023 incident. *Id.* at 32 ¶ 107. Plaintiff alleges that Mallery later threatened that Plaintiff's "security level would be raised so that he would be transferred back to NBCI, where [Mallery's] 'buddies would finish what they started.'" *Id.* at 32 ¶ 108.

### B.    Procedural Background

Plaintiff initially sued only NBCI, Rounds, and Wolford and raised claims related to the December 21, 2020 incident. ECF 6, at 1–3 (amended complaint). On March 7, 2023, Judge Chuang, to whom this matter was previously assigned, granted in part and denied in part a motion to dismiss[4] that amended complaint. *See* ECF 25, also found at *McCall v. N. Branch Corr. Inst.*,

---

[4] Defendants' motion was also styled in the alternative as one for summary judgment, but Judge Chuang construed it as a motion to dismiss "[b]ecause McCall ha[d] not yet had the opportunity

Civ. No. TDC-22-0357, 2023 WL 2393282 (D. Md. Mar. 7, 2023). Specifically, the Court dismissed Plaintiff's claim against NBCI pursuant to NBCI's Eleventh Amendment immunity, ECF 25, at 8, but refused to dismiss Plaintiff's excessive force claim against Rounds and Wolford, *id.* at 9–10. Judge Chuang also appointed counsel for Plaintiff who had previously proceeded pro se. ECF 27. On October 23, the case was reassigned to the undersigned. In March of 2024, Plaintiff sought, and was granted, leave to file the operative second amended complaint, ECF 42; ECF 52; ECF 53, in which he added allegations against additional defendants, nearly all of whom now move to dismiss Plaintiff's claims. The Court accordingly addresses today only the claims added against Defendants in the operative complaint as Judge Chuang has previously dealt with the other claims.

## II.   **LEGAL STANDARDS**

### A.   **Rule 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained" therein. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

---

to engage in such discovery that could reveal information relevant to the issue of summary judgment." ECF 25, at 10–11. "Even if the Court were to consider [the earlier motion to dismiss] as to summary judgment," Judge Chuang observed that "the present record reveals a genuine dispute of material fact which precludes summary judgment." *Id.* at 11.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

### B.    Rule 56

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## C.    Construing the Motions as Motions to Dismiss

When presented with a motion to dismiss or, in the alternative, for summary judgment, the disposition of the motion "implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure." *Pevia v. Hogan*, 443 F. Supp. 3d 612, 625 (D. Md. 2020). "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). In such a case, "[a]ll parties must be given a reasonable opportunity to present all the

10

material that is pertinent to the motion." *Id.*; *Johnson v. RAC Corp.*, 491 F.2d 510, 513 (4th Cir. 1974) (citing *Carter v. Stanton*, 405 U.S. 669, 671 (1972)).

As noted, the Supervisory Defendants seek dismissal or, in the alternative, summary judgment on all claims pending against them. ECF 67, at 1. Plaintiff asks the Court to "deny the S[upervisory] Defendants' request in the alternative for summary judgment" because "Federal Rule 56(d) provides that summary judgment is inappropriate where discovery has not occurred, and important facts are not available to the non-movant." ECF 101, at 25. Plaintiff still seeks access to "documents Defendants possess regarding [Plaintiff's] complaints and the administrative process." *Id.* at 26. As Plaintiff observes, although Supervisory Defendants attach to their motion an "exhibit purporting to be [Plaintiff's] only relevant ARP," Plaintiff alleges that he filed additional relevant ARPs that have not been provided to him. *Id.* (citing ECF 54, at 27 ¶ 90, 29 ¶ 98, 30 ¶ 100).

The Court agrees with Plaintiff. "Generally, summary judgment must be 'refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'" *Shaw v. Foreman*, 59 F.4th 121, 128 (4th Cir. 2023). Typically, a "nonmovant presents such opposition in the form of a Rule 56(d) affidavit, stating that he 'cannot present facts essential to [his] opposition.'" *Id.* (quoting Fed. R. Civ. P. 56(d)). However, "a district court abuses its discretion by granting summary judgment when it otherwise has 'fair notice of . . . potential dispute[s] as to the sufficiency of the summary judgment record.'" *Id.* (quoting *Pledger v. Lynch*, 5 F.4th 511, 526 (4th Cir. 2021)); *see also McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 484 (4th Cir. 2014) (noting that Rule 56(d) motions are "broadly favored and should be liberally granted" (citation omitted)). Although Plaintiff has not filed a formal Rule 56(d) affidavit, he has put the Court on notice as to which specific facts are yet to be discovered in a

11

section in his opposition memorandum arguing that the motion should be denied pursuant to Rule 56(d). ECF 101, at 25–28. Moreover, Defendants do not contest Plaintiff's position on this point in their reply. *See* ECF 106. Accordingly, the Court construes the Supervisory Defendants' motion as a motion to dismiss.[5]

## III.    ANALYSIS

The second amended complaint contains thirteen counts. Defendants do not challenge the viability of the counts alleging wrongdoing on the parts of Defendants Wolford and Rounds—specifically the constitutional excessive force claims (Counts I and IV)—which were previously addressed by the Court's memorandum opinion issued on March 7, 2023.[6] *See generally* ECF 25. Defendants now challenge the additional counts included by Plaintiff in the second amended complaint. The Court generally divides its discussion first according to the motions, and then according to the counts.

### A.    Supervisory Defendants' Motion to Dismiss

Plaintiff brings § 1983 claims against Puffenbarger in her individual capacity and AW Butler, Warden Weber, and Commissioner Morgan, in both their individual and official capacities,

---

[5] Officer Defendants' motion to dismiss "incorporate[s] the Motion to Dismiss, or in the Alternative, For Summary Judgment filed on behalf of Defendants Dean Rounds, Jr. and Jeremy Wolford as if fully incorporated herein." ECF 97-1, at 4 n.1 (referencing ECF 67). To the extent that such incorporation, or the inclusion of the heading "summary judgment" in the table of contents of Defendants' motion to dismiss, ECF 97-1, at 1, is a request of this Court to construe ECF 97 as a motion for summary judgment, the Court likewise declines to do so. In addition to the reasons stated above, ECF 97 is titled "motion to dismiss" and the "standard of review" section of the supporting memorandum discusses only Rule 12(b)(6). ECF 97-1, at 8–9.

[6] The motions to dismiss also do not address the claim against Wolford in Count V, the state law assault claim. They similarly do not address the allegations made against Wolford and Rounds in Count VI, the state law battery claim, or in Count VII, the state law civil conspiracy claim. Accordingly, the Court does not address those portions of the second amended complaint as to Wolford and Rounds.

alleging violations of the Eighth Amendment (Count XII).  ECF 54, at 50.  Plaintiff also raises

similar allegations against these defendants under Article 25 of the Maryland Constitution (Count

XIII).  *Id.* at 54.  Supervisory Defendants counter that they are entitled to Eleventh Amendment

immunity for those claims for which they are sued in their official capacity.[7]  ECF 67-1, at 6–7.

Supervisory Defendants argue that all individual capacity claims must also be dismissed because

Plaintiff has "(1) alleged claims based on an unsupported *respondeat superior* theory of liability

and that none of the Supervisory Defendants had personal participation in the alleged misconduct;

and (2) failed to allege any facts from which a reasonable fact-finder could conclude the

Supervisory Defendants had advanced knowledge of an impending assault and failed or refused to

prevent it."  ECF 101, at 18; ECF 67-1, at 7–12.

### 1.    Eleventh Amendment Immunity

Under the Eleventh Amendment of the United States Constitution, a state, its agencies, and

its departments are immune from citizen suits in federal court absent state consent or congressional

action.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  Claims against

state employees acting in their official capacities are also subject to Eleventh Amendment

immunity because a suit against the state actor is tantamount to a suit against the state itself.  *See*

*Brandon v. Holt*, 469 U.S. 464, 471–72 (1985).  "Although the State of Maryland has waived its

sovereign immunity for certain types of cases brought in state courts, *see* Md. Code, State Gov't

§ 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal

court."  *Pevia v. Hogan*, 443 F. Supp. 3d 612, 632 (D. Md. 2020).

---

[7] Defendants assert that "Plaintiff does not specify whether he is suing Defendants in their official capacity."  ECF 67-1, at 7.  However, as Plaintiff points out, the second amended complaint "expressly states that Plaintiff is suing the three Senior Defendants in both their individual and official capacities."  ECF 101, at 18 (citing ECF 54, at 2 (case caption), 50 (Count XII), 54 (Count XIII)).

Plaintiff asserts that the claims against AW Butler, Warden Weber, and Commissioner Morgan in their official capacity nonetheless survive because of the *Ex parte Young* exception to Eleventh Amendment immunity. "[T]he *Ex parte Young* exception to Eleventh Amendment immunity remains generally available to a plaintiff who seeks prospective declaratory and injunctive relief against a state official for an ongoing violation of federal law."[8] *TFWS, Inc. v. Schaefer*, 242 F.3d 198, 204 (4th Cir. 2001) (citations omitted); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). However, "[j]ust because a private citizen's federal suit seeks declaratory injunctive relief against State officials does not mean that it must automatically be allowed to proceed under an exception to the Eleventh Amendment protection." *Bell Atl. Md., Inc. v. MCI Worldcom, Inc.*, 240 F.3d 279, 294 (4th Cir. 2001). To determine if this exception applies, courts consider "whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Biggs v. N.C. Dep't of Pub. Safety*, 953 F.3d 236, 242 (4th Cir. 2020) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). This is a "straightforward inquiry" and "does not include an analysis of the merits of the claim." *Verizon Md., Inc.*, 535 U.S. at 646.

At several points in the second amended complaint, Plaintiff alleges that the risk to his physical safety at WCI is "ongoing." *See, e.g.*, ECF 54, at 51 ¶¶ 214–15, at 53 ¶ 222, at 57 ¶ 239. This is more than mere speculation as Plaintiff has already been stabbed while in general population and after expressing fear to Puffenbarger that he would be harmed. To that end, Plaintiff seeks "an order for appropriate injunctive relief directed against Defendants Puffenbarger,

---

[8] The *Ex parte Young* exception rests on the notion "that a State officer who acts in violation of the Constitution is 'stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.'" *Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002) (quoting *Ex parte Young*, 209 U.S. 123, 160 (1908)).

[Commissioner Morgan, AW Butler, and Warden Weber] in Counts XIII and XIV in order to prevent the misconduct complained of herein and to protect Mr. McCall from similar misconduct in the future." ECF 54, at 59. Supervisory Defendants do not appear to dispute that Plaintiff has alleged an ongoing violation of federal law. *See* ECF 67-1, at 7–8; ECF 106, at 2–3. However, they argue that the *Ex parte Young* exception is nonetheless inapplicable because although Plaintiff is seeking prospective relief as to Count XIII, Plaintiff is "not entitled" to such relief. ECF 106, at 3. Defendants suggest that the Court should evaluate Plaintiff's requested relief under the standard for a preliminary injunction—*i.e.*, "(1) [] likelihood of success on the merits; (2) [] likelihood of suffering irreparable harm in the absence of preliminary relief; (3) [whether] the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest." *Id.* at 2 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

The Court disagrees. The United States Supreme Court has made clear that "inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim," *Verizon Md., Inc.*, 535 U.S. at 646, which is exactly what evaluating Plaintiff's "likelihood of success on the merits" would require. Rather, the Court is only concerned at this stage of the litigation with assessing whether the complaint "[(1)] alleges an ongoing violation of federal law and [(2)] seeks relief properly characterized as prospective." *Biggs*, 953 F.3d at 242. It does. Plaintiff repeatedly claims that the risk to his safety through continued unlawful activity is ongoing. And with respect to the latter prong, a "prayer for injunctive relief . . . clearly satisfies [the] 'straightforward inquiry.'" *Verizon Md. Inc.*, 535 U.S. at 636. Plaintiff has plausibly alleged an ongoing violation of federal law by state officials in their failure to transfer him to a safer facility and thus can proceed under the *Ex parte Young* exception to Eleventh Amendment immunity. *See Harvin v. Cheney*, No. 3:23CV328 (MPS), 2023 WL 3846258, at *7 (D. Conn. June 6, 2023)

(permitting a prisoner suit alleging an "ongoing Eighth Amendment violation due to the failure to remove him from his allegedly unsafe conditions of confinement" to proceed against prison leadership since those individuals "could plausibly provide him with the requested relief").

        2.     Stating a Claim for Failure to Protect

             *i.*     *Eighth Amendment*

42 U.S.C. § 1983 is not itself a source of substantive rights but provides "a method for vindicating federal rights." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quotation omitted). It allows suits against any "person" acting under color of state law who subjects the claimant to "the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Count XII of the second amended complaint is a § 1983 claim premised on Puffenbarger's and Supervisory Defendants' alleged violation of the Eighth Amendment by failing to protect Plaintiff from assault. ECF 54, at 50.

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 832, (1994)). "These [duties] include maintaining humane conditions of confinement, including the provision of adequate medical care and, relevant to this case, 'reasonable measures to guarantee the safety of the inmates.'"[9] *Id.* (quoting *Farmer*, 511 U.S. at 832). An alleged failure to take reasonable measures to guarantee an incarcerated individual's safety is sometimes called a "failure to protect" claim. *See, e.g., Shiheed v. Johnson*, No. CV SAG-23-1613, 2024 WL 4838840, at *5 (D. Md. Nov. 20, 2024). Plaintiff alleges that prison

---

[9] The imposition of such duties under the Eighth Amendment flow from the notion that being subjected to violence in prison, for example, is "simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 337 (1981)).

officials here violated the duty "to protect [him] from violence at the hands of other prisoners." *See Farmer*, 511 U.S. at 832.

However, "[n]ot every injury suffered by a prisoner at the hands of another establishes liability against a prison official." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010). "To make a valid claim under the Eighth Amendment, a prisoner must satisfy two elements." *Id.* "First, 'the deprivation alleged must be sufficiently serious.'" *Id.* (quoting *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir.2003)). "To demonstrate such an extreme deprivation, a prisoner must allege a serious or significant physical or emotional injury resulting from the challenged conditions." *Id.* (quoting *Odom*, 349 F.3d at 770).

"Second, a prisoner must demonstrate that the prison official had a 'sufficiently culpable state of mind.'" *Id.* (quoting *Odom*, 349 F.3d at 770). Under the Eighth Amendment, "the requisite state of mind is one of deliberate indifference to inmate health or safety." *Id.* (quoting *Odom*, 349 F.3d at 770). "A prison official demonstrates deliberate indifference if he 'knows of and disregards an excessive risk to inmate health or safety.' In other words, 'the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so.'" *Id.* (first quoting *Odom*, 349 F.3d at 770; and then quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir.2002)). "[A]ctual knowledge of facts from which a reasonable person might have inferred the existence of the substantial and unique risk to" Plaintiff is not enough[10]—the defendant "must actually have drawn the inference." *Rich v. Bruce*, 129 F.3d 336, 340 & n.2 (4th Cir. 1997).

---

[10] The Fourth Circuit recently held that "*pretrial* detainees can state a claim based on a purely objective test under the Fourteenth Amendment for prison officials' deliberate indifference to excessive risks of harm to the inmate." *Short v. Hartman*, 87 F.4th 593, 603–04 (4th Cir. 2023) (emphasis added), *cert. denied*, 144 S. Ct. 2631 (2024). However, Plaintiff does not appear to be a pretrial inmate.

### ii.    Article 25

Article 25 of the Maryland Declaration of Rights similarly proscribes "cruel or unusual punishment inflicted[ ] by the Courts of Law." Md. Const. Decl. of Rts. art. 25. Article 25 is "construed *in pari materia* with the Eighth Amendment." *Jordan v. Davis*, Civ. No. ELH-22-1541, 2023 WL 2478862, at *1 n.4 (D. Md. Mar. 13, 2023); *Harris v. State*, 276 A.3d 1071, 1093 (Md. 2022) (describing the Supreme Court of Maryland's "longstanding precedent of interpreting Article 25 *in pari materia* with the Eighth Amendment").

### 3.    Personal Involvement and Supervisory Liability

When bringing suit against state officials in their individual capacities, "[l]iability under § 1983 is conditioned on a showing of some personal involvement or participation in the denial of civil rights." *McAdoo v. Toll*, 591 F. Supp. 1399, 1404 (D. Md. 1984) (first citing *Rizzo v. Goode*, 423 U.S. 362 (1978); and then citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). However, a state official can also "be in a § 1983 suit . . . [,] in a more limited way, [in] his supervisory capacity." *King v. Rubenstein*, 825 F.3d 206, 223 (4th Cir. 2016).

Although ordinary principles of *respondeat superior* do not apply under § 1983, "[i]t is well settled that 'supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994)). "Such liability . . . is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Id.* (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). "In order to establish supervisory liability under § 1983," Plaintiff must plead that:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response

18

> to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices [ ]; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* (quoting *Shaw*, 13 F.3d at 799). Whether supervisory liability exists is generally an issue "of fact, not law." *Shaw*, 13 F.3d at 799 (citing *Avery v. County of Burke*, 660 F.2d 111, 114 (4th Cir. 1981)).

"As to the first element, '[e]stablishing a pervasive and unreasonable risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions[.]'" *Wilkins v. Montgomery*, 751 F.3d 214, 226–27 (4th Cir. 2014) (internal quotation marks omitted) (quoting *Shaw*, 13 F.3d at 799). "A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983). As to the second, "a plaintiff 'may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses.'" *Id.* (quoting *Shaw*, 13 F.3d at 799). "Finally, as to the third element, 'proof of causation may be direct . . . where the policy commands the injury of which the plaintiff complains . . . or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions.'" *Id.* (quoting *Shaw*, 13 F.3d at 799).[11]

---

[11] The Supervisory Defendants argue that Plaintiff must proceed against them under a theory of supervisory liability because there is no requisite personal involvement in the constitutional violation of the type alleged here, where the only conduct at issue is the review of grievances or complaints. *See* ECF 67-1, at 7–9; *see also* ECF 101, at 24. The Court has doubts about whether such a theory is appropriate here given that Plaintiff has generally alleged that Puffenbarger, Commissioner Morgan, Warden Weber, and AW Butler each personally engages in some act that failed to protect Plaintiff from harm. Nevertheless, the Court reviews the standard associated with supervisory liability for the sake of thoroughness and because it concludes that under a theory of either direct or supervisory liability, Plaintiff has failed to plead a failure to protect claim against AV Butler, Warden Weber, and Commissioner Morgan.

As to Puffenbarger, Plaintiff alleges that "[a]fter expressing orally to Defendant Puffenbarger on March 2, 2023, that [Plaintiff] feared being placed in general population at WCI because he feared retaliation due to his civil lawsuit against NBCI Defendants Rounds and Wolford, Defendant Puffenbarger recklessly ignored his warning." ECF 54, at 50. Plaintiff also alleges that Puffenbarger "recklessly ignored [Plaintiff]'s March 8, 2023 written grievance that [Plaintiff] feared retaliation as a result of his civil law suit against NBCI Defendants Rounds and Wolford without further investigation and kept [Plaintiff] at substantial risk of suffering serious harm in general population." *Id.* at 50 ¶ 211.

As to Warden Weber and AW Butler, Plaintiff alleges that they learned of an objectively serious risk of harm to Plaintiff when "on March 8, 2023, [Plaintiff] filed a grievance directed to the 'Warden, Managing Official, or Designee of Facility,' informing them of his fears." ECF 54, at 50–51 ¶ 212. Plaintiff alleges that they refused to investigate or intervene and consequently, "consistent with [Plaintiff's] warnings, a white inmate belonging to a white supremacy gang attempted to murder [Plaintiff] on April 6, 2023." *Id.* at 51 ¶ 213. Further, as to Commissioner Morgan and Warden Weber, Plaintiff alleges that they were made "aware of the danger to [Plaintiff] from being housed in general population as a result of [Plaintiff]'s counsel's June 14, 2023 letter to them" and still "refused to transfer [Plaintiff] . . . to another Maryland institution." *Id.* at 51–52 ¶ 215. Plaintiff ultimately avers that "[t]here is a direct link, built on [Plaintiff's] written paper trail and verbal history of requests for protection—starting after the December 21, 2020 attack on Mr. McCall and later, both before and after the April 6, 2023 attempt to murder him—and [] Puffenbarger's, Warden Weber's, and [AW] Butler's" alleged disregard of Plaintiff's concerns about being housed in the general population at WCI. *Id.*

Supervisory Defendants contend that "Plaintiff's sole theory of liability rests on Plaintiff allegedly submitting a grievance which was directed to Warden Weber and [AW] Butler." ECF 67-1, at 8. Such an allegation, they argue, constitutes insufficient personal involvement or knowledge of the supervisor to give rise to liability. *Id.* In primary support for that contention, Supervisory Defendants cite *Sealey v. Giltner*, a case in which the United States Court of Appeals for the Second Circuit upheld the district court's determination that the plaintiff "failed to allege sufficient personal involvement on [the supervisory officer's] part to make him liable under [§] 1983." 116 F.3d 47, 51 (2d Cir. 1997). In so reasoning, the Second Circuit observed that the plaintiff had written two letters to the supervisory official, the first of which that official had referred to someone else and the second of which that official had responded to by directing the plaintiff to the decision in the matter that was previously referred. *Id.*[12]

Plaintiff characterizes Defendants' reading of the second amended complaint as "erroneously narrow." ECF 101, at 21. Plaintiff asserts that he "has alleged a pattern of misconduct including a series of violent acts committed by NBCI and WCI officers and a WCI inmate against him. And he has alleged that he notified the [Supervisory] Defendants . . . by submitting multiple ARPs to Defendant Weber and his designees and by sending a letter from his counsel to Defendant Morgan and Defendant Weber." *Id.* at 21 (citing ECF 54, at 27 ¶ 90 (March 8, 2023 ARP), at 29 ¶ 98, at 30 ¶¶ 100–01 (June 14, 2023 letter from Plaintiff's counsel to Morgan and Weber)). And Plaintiff contends that he has "expressly pled that, rather than delegating [Plaintiff]'s ARP to a

---

[12] *See also, e.g.*, *Webster v. Fletcher*, 694 F. Supp. 2d 163, 180 (N.D.N.Y. 2010) (commissioner forwarding two unrelated letters and one related letter to the allegations in his complaint not enough to sustain liability against a supervisory official); *Liner v. Goord*, 310 F. Supp. 2d 550, 555 (W.D.N.Y. 2004) ("[T]he fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement." (quoting *Thomas v. Coombe*, No. 95 Civ. 10342, 1998 WL 391143, *6 (S.D.N.Y. July 13, 1998)).

subordinate to handle, Defendant [AW] Butler himself denied one of [Plaintiff]'s ARPs." *Id.* at 24. Moreover, "rather than delegating to subordinates the letter [Plaintiff]'s counsel wrote," Plaintiff alleges that both "[Commissioner] Morgan and [Warden] Weber responded . . . yet refused to take any action." *Id.* at 25. Plaintiff also points to sections of the second amended complaint alleging public records reflecting the purportedly troubled history of some NBCI and WCI employees, as well as a lawsuit where summary judgment was denied on an inmate's claims involving racist comments allegedly made at NBCI.[13] *Id.* at 23–24 (citing ECF 54, at 35 ¶ 127, at 22–23 ¶¶ 72–76).

There are factual distinctions between this case and *Sealy*, most notably that Plaintiff alleges that the Supervisory Defendants personally received and responded to grievances and complaints, rather than delegating them to others. *See* ECF 101, at 24–25. However, the Court still finds that the allegations against AW Butler, Warden Webber, and Commissioner Morgan fail to meet the standard for pleading a failure to protect claim. The deliberate indifference standard requires "that the official in question subjectively recognized a substantial risk of harm. It is not enough that the officers *should* have recognized it; they actually must have perceived the risk." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (citation omitted) (emphasis in original). Further, "it is not enough that the official *should have* recognized that his actions were inappropriate; the official actually *must have* recognized that his actions were insufficient." *Id.* (emphasis in original). The amended complaint alleges few specifics as to what these three officials were told, but generally asserts that the first grievance alleged fear at the hands of WCI

---

[13] Though unquestionably troubling, general public records regarding the allegedly racist history of some NBCI and WCI employees, or *ongoing* litigation related to some of those employees, does not plausibly allege supervisors' actual knowledge of the *specific alleged misconduct* Plaintiff complains of here with respect to the named Officer Defendants.

officers due to the "family relationship, friendship, etc." between WCI officers and NBCI officers. ECF 54, at 27 ¶ 90. A second complaint took issue with Puffenbarger and her initial handling of Plaintiff's custody status. *Id.* at 29 ¶ 98. A third grievance largely took issue with medical treatment and new harassment by officers. *Id.* at 30 ¶ 100. The letter from counsel is vaguely described as "raising concerns" for Plaintiff's safety and seeking a transfer to another institution. *Id.* at ¶ 101.

Though these grievances (and counsel's letter) all raise serious issues, they fail to allege, as it relates to personal liability, a sufficiently culpable state of mind on the part of Commissioner Morgan, Warden Weber, and AW Butler of deliberate indifference. Further, it is unclear from the face of the amended complaint what was told to Commissioner Morgan and Warden Weber about Plaintiff's situation in the letter from counsel, and why Plaintiff's subsequent placement in administrative segregation, *id.* at 28 ¶ 96, failed to provide them with reasonable assurances as to Plaintiff's safety sufficient to deny the more significant request for a transfer to a specific institution.

As it relates to alleged supervisory liability, the allegations fail to support a finding that the response to Puffenbarger's actions was so inadequate as to implicate the Eighth Amendment. To the contrary, the allegations support a finding that these defendants conducted some sort of investigation into Plaintiff's allegations and, taken in the light most favorable to Plaintiff, were given false information about Plaintiff's initial meeting with Puffenbarger. *See* ECF 54, at 29 ¶ 99 (summarizing AW Butler's response to Plaintiff's grievance as noting that "[f]urther investigation revealed that when you transferred to WCI on March 2, 2023, you did not notify anyone that you were possibly in danger. Therefore, you were placed on general population."). In sum, the claims against these three defendants fail to plausibly allege they perceived the risk of harm and ignored

it, or that they knew the actions they took in response to the letter from counsel and in response to Plaintiff's grievances were·constitutionally insufficient.[14]

As it relates to Puffenbarger, however, the Court agrees that Plaintiff's allegations—which the Court accepts as true for purposes of the motion—compel a different result at this early stage of litigation. Plaintiff claims that Puffenbarger was explicitly told of Plaintiff's concerns during an in-person meeting prior to the April 6, 2023 incident. ECF 54, at 27 ¶ 89. As such, Plaintiff has sufficiently alleged that Puffenbarger's refusal to act on apparently detailed information may have "posed a pervasive and unreasonable risk of constitutional injury" sufficient to state a claim under the Eighth Amendment as it relates to supervisory liability in that she knew of the risk to Plaintiff of assault and did nothing. *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001). Though these allegations may not survive to trial, the Court is tasked at this early stage of litigation with taking "all reasonable inferences in favor of the plaintiff and consider[ing] whether the complaint states a plausible claim for relief on its face." *Nemet Chevrolet, Ltd.*, 591 F.3d at 253.[15] Although the second amended complaint contains no allegations connecting Mr. Ellis, the WCI

---

[14] The Supervisory Defendants point out that, as to Commissioner Morgan, Plaintiff alleges that he was only "made aware of these claims on June 14, 2023 through a letter from Plaintiff's counsel," "more than two months after the alleged incident" at WCI. ECF 67-1, at 3. The Court agrees that to the extent Plaintiff is attempting to hold Commissioner Morgan liable for harm prior to that date, the letter is insufficient to establish his knowledge of the alleged risk Plaintiff was facing.

[15] The Court again notes that the deliberate indifference standard requires "that the official in question subjectively recognized a substantial risk of harm. It is not enough that the officers *should* have recognized it; they actually must have perceived the risk." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (citation omitted) (emphasis in original). Further, "it is not enough that the official *should have* recognized that his actions were inappropriate; the official actually *must have* recognized that his actions were insufficient." *Id.* (emphasis in original). As it relates to Puffenbarger, Plaintiff's allegations—which the Court accepts as true for purposes of the motion—satisfy that he explicitly told her of his concerns and that she drew the necessary inferences required under the standard but did nothing.

inmate who stabbed Plaintiff on April 6, 2023, with any officers at WCI or NBCI acting to retaliate against Plaintiff, the inquiry at this stage asks a different question: whether it is plausible that "the defendant[] [was] 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed],' and whether they in fact drew such an inference but disregarded it." *Odom*, 349 F.3d at 770–71 (quoting *Farmer*, 511 U.S. at 837). Plaintiff alleges that he met with and told Puffenbarger of a "substantial and unique risk" to him. *Rich*, 129 F.3d at 340. And particularly given that Plaintiff *was* subsequently attacked, the Court cannot conclude that Puffenbarger's decision to ignore Plaintiff's warnings fail to meet this threshold standard. Further, Plaintiff alleges that Puffenbarger may have told AW Butler that Plaintiff did not report that he was in danger. ECF 54, at 29 ¶ 99. If Plaintiff's allegations are true, this subsequent misstatement may bear on why she refused to allow Plaintiff into protective custody prior to the April 6, 2023 assault despite his explicit request. Accordingly, the Court determines that Counts XII and XIII survive as they relate to Puffenbarger.

### B.    Officer Defendants' Motion to Dismiss

#### 1.    State Law Immunity

To the extent that the Officer Defendants are sued under Maryland law, they are "State personnel"[16] being sued in the performance of their public duties, and thus entitled to immunity under the Maryland Tort Claims Act ("MTCA"). ECF 97-1, at 12 (quoting Md. Code Ann., State Gov't § 12-105). Specifically, Koelker, Vinci, Spence, and Yoder argue that the Court should dismiss Count III, the claim for failure to intervene brought under Article 25 of the Maryland Declaration of Rights. ECF 97-1, at 12 (quoting Md. Code Ann., State Gov't § 12-105). Defendant

---

[16] "State personnel" are defined in § 12-101 of the State Government Article. Md. Code Ann., SG § 12-101(a). No party disputes that the Defendants fall within that definition.

Koelker likewise argues that he is immune from Plaintiff's state law claim for assault, ECF 97-1, at 15, Count V of the second amended complaint, ECF 54, at 42.[17]

Section 105 of the State Government ("SG") Article states that "State personnel shall have the immunity from liability described under § 5-522(b) of the Courts and Judicial Proceedings Article." SG § 12-105. Section 5-522(b) of the Courts and Judicial Proceedings Article ("CJP") further provides that "State personnel, as defined in § 12-101 of the State Government Article, are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence, and for which the State or its units have waived immunity[.]" CJP § 5-522(b).

The "MTCA does not distinguish between constitutional torts and common law torts. Accordingly, the same standards of malice and gross negligence govern" state common-law tort claims and violations of state constitutional rights. *McDaniel v. Arnold*, 898 F. Supp. 2d 809, 849 (D. Md. 2012) (quoting *Newell v. Runnels*, 967 A.2d 729, 766 n.28 (Md. 2009)). "Thus, for purposes of MTCA immunity, 'malice' refers to so-called 'actual malice,' *i.e.,* 'conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud.'" *Id.* (internal quotation marks omitted) (quoting *Lee v. Cline*, 863 A.2d 297, 311 (Md. 2004)). Gross negligence, on the other hand, "occurs when the defendants act 'in reckless disregard of the consequences as affecting the life or property of another . . . without the exertion of any effort to avoid them . . . or [are] so utterly indifferent to the rights of others that [they] act[]

---

[17] Officer Defendants only appear to challenge the claim against Koelker on the grounds that he was immune from such a claim under the MTCA. *See* ECF 97-1, at 14–15; ECF 106, at 5. Thus, the Court considers Count V no further than the discussion above with respect to MTCA immunity. And because the Court ultimately holds below that Plaintiff has plausibly alleged malice or gross negligence as to Koelker, Count V survives Officer Defendants' motion to dismiss.

as if such rights did not exist.'" *Id.* (alterations in original) (quoting *Barbre v. Pope*, 935 A.2d 699, 717 (Md. 2007)).

Defendants argue that there are no allegations in the second amended complaint that Koelker, Vinci, Spence, or Yoder acted with malice or gross negligence. ECF 97-1, at 14; *id.* at 15 ("[T]he context described in the SAC, with respect to the alleged threats made to Plaintiff, demonstrates that Defendant Koelker sought to maintain safety and compliance in the facility."). Plaintiff maintains that he plausibly alleges malice or gross negligence on the part of Koelker, Vinci, Yoder, and Spence because Koelker allegedly "threatened to beat" Plaintiff and then Koelker, Vinci, and Yoder "deliberately assisted in the transportation of Mr. McCall to the Medical Room, which was out of reach of video surveillance, and stood at the doorway or inside the room while Mr. McCall was attacked." ECF 101, at 32 (citing ECF 54, at 13 ¶ 33, at 15–17 ¶¶ 40–50). The operative complaint "also alleges that after witnessing this attack Defendants Vinci, Spence, Wolford, Rounds, and Koelker disposed of evidence of the assault." *Id.* (citing ECF 54, at 17 ¶ 52).

The Court agrees with Plaintiff that a plausible inference flowing from the allegations in the second amended complaint is that Koelker, Vinci, Spence, and Yoder acted with malice or gross negligence insofar as Plaintiff alleges that they assisted Rounds and Wolford in assaulting Plaintiff in the medical room after Plaintiff had been handcuffed and restrained. *Cf. Cooper v. Rodriguez*, 118 A.3d 829, 833, 846 (2015) (holding that "the trial court erred in striking the jury's finding of gross negligence by the correctional officer and in concluding that" he was entitled to immunity where "the officer responsible for protecting . . . the inmates on the bus, sat several feet away while [the decedent] was systematically choked to death and had his throat cut; and [the

officer] took no action whatsoever"). Accordingly, the MTCA does not warrant dismissal of the Plaintiff's state law claims at this stage of the litigation.

### 2.    Counts II and III (Failure to Intervene)

In Count II of the second amended complaint, Plaintiff alleges a § 1983 failure to intervene claim against Koelker, Vinci, Spence, and Yoder, in their individual capacities. ECF 54, at 37. Plaintiff alleges that these defendants were involved in securing and/or observing Plaintiff as Wolford and Rounds physically assaulted him. *Id.* at 15–17 ¶¶ 40–49. Count III alleges a failure to intervene claim against the same defendants under Article 25 of the Maryland Declaration of Rights. *Id.* at 39.[18]

The failure to intervene cause of action has been recognized by the Fourth Circuit, and it is "'premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them.'" *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416–17 (4th Cir. 2014) (quoting *Randall v. Prince George's Cnty.*, 302 F.3d 188, 203 (4th Cir. 2002)). As the Fourth Circuit explained in *Randall*, "such a duty attaches when an officer observes or has reason to know that 'a constitutional violation [is being] committed' by other officers and possesses 'a realistic opportunity to intervene to prevent the harm from occurring.'" 302 F.3d at 203–04 (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). Failure to intervene claims are thus "by nature, concomitant with a plaintiff's other § 1983 claims." *Johnson*, 2020 WL 1169739, at *15 (citing *Hinkle v. City of Clarksburg*, 81 F.3d 416, 420 (4th Cir. 1996)).

To state a claim for failure to intervene, a plaintiff must assert that an officer was (1) "confronted with a fellow officer's illegal act," (2) "possesse[d] the power to prevent it," and (3) "cho[se] not to act." *Burley v. Baltimore Police Dep't*, 422 F. Supp. 3d 986, 1030 (D. Md. 2019)

---

[18] As noted above, Article 25 is "construed *in pari materia* with the Eighth Amendment." *Jordan*, 2023 WL 2478862, at *1 n.4; *Harris*, 479 Md. at 121.

(quoting *Brooks v. Johnson*, 924 F.3d 104, 110 (4th Cir. 2019)). This theory of liability has been extended to correctional officers as it relates to the alleged failure to stop clearly unlawful activity. *See, e.g.*, *Allen v. Bond*, No. 5:22-CV-00134-MR, 2023 WL 438801, at *6 (W.D.N.C. Jan. 25, 2023) (allowing a claim of bystander liability to survive frivolity review where a plaintiff alleged that the accused officers failed to prevent the unjustified use of pepper spray by another officer and failed to intervene during an assault); *Gray v. Hingleton*, No. 4:22-CV-3887-JD-TER, 2023 WL 9284357, at *6 (D.S.C. Dec. 1, 2023), *report and recommendation adopted*, No. 4:22-CV-03887-JD-TER, 2024 WL 169097 (D.S.C. Jan. 16, 2024) (permitting a claim of bystander liability to survive summary judgment where the accused correctional officer allegedly "watched three other officers assault Plaintiff for five to ten minutes and shut the cell door when he realized other inmates were watching, nothing prevented him from stopping the assault during that time, but he chose not to act to stop the assault for that period of time").

Officer Defendants argue that Plaintiff fails to state a claim because he cannot allege that the Officer Defendants were confronted with an illegal act under the Eighth Amendment when Wolford and Rounds allegedly assaulted Plaintiff. ECF 97-1, at 10–12. However, the Court has already held that Plaintiff's complaint plausibly states a claim for excessive force in violation of the Eighth Amendment with respect to the alleged assault carried out by Wolford and Rounds. *See McCall*, 2023 WL 2393282, at *5–6. Thus, if Plaintiff has alleged sufficient facts to support a reasonable inference that Koelker, Vinci, Spence, and Yoder possessed the power to prevent the assault but chose not to act, then Plaintiff has stated a claim for failure to intervene. Plaintiff has done so here. Plaintiff has alleged that, after Koelker threatened to "whoop" him, ECF 54, at 13 ¶ 33, Vinci and Spence then helped carry Plaintiff to the medical room with Wolford and Rounds, *id.* at 15 ¶ 40. Plaintiff has further alleged that Koelker, Vinci, Spence, and Yoder were in the

Medical Room at the time of the assault and either stood by and watched or actively assisted in restraining Plaintiff while Wolford and Rounds assaulted him. *See* ECF 54, at 16 ¶¶ 46, 49, 37 ¶ 136. The Court determines that those allegations, taken together with allegations relating to the assault itself, *id.* at 16 ¶¶ 46–49, give rise to an inference that Koelker, Vinci, Spence, and Yoder "allowed the assault to occur without taking any action to prevent it, despite having a reasonable opportunity to do so." ECF 101, at 30. The Court therefore holds that Counts II and III survive Officer Defendants' motion to dismiss.

### 3.    Count VII (Civil Conspiracy)

Count VII of the second amended complaint alleges that Defendants Wolford, Rounds, Vinci, Spence, Yoder, Koelker, Gilpin, Crites, and Smith "acted together to agree and conspire to unlawfully violate [Plaintiff's] rights by taking him to the Medical Room to assault and commit battery against him on December 21, 2020," ECF 54, at 44–45 ¶¶ 179–81, and that "Gilpin, Smith, and Crites . . . attempt[ed] to cover up misconduct via bribery," ECF 97-1, at 16 (citing ECF 54, at 45 ¶ 181).

First, Defendants assert that "as set forth in this Court's October 4, 2024 Memorandum Opinion, the obstruction of justice claim is legally insufficient on its face, and Plaintiff's leave to amend was denied as to this count." *Id.* (citing ECF 52). Plaintiff responds that while the Court's opinion did deny Plaintiff's motion for leave to amend his complaint with respect to his obstruction of justice claim because it was not a cognizable civil claim, that does not per se preclude Plaintiff's conspiracy claim. ECF 101, at 35–36. The Court agrees with Plaintiff that the civil conspiracy count is distinct from the former obstruction of justice claim and determines that Plaintiff was not precluded from adding the civil conspiracy count to its second amended complaint on the ground that it merely duplicates a count that was previously dismissed.

Defendants also contend that Count VII should be dismissed because Maryland does not recognize the tort of civil conspiracy. ECF 97-1, at 15. However, unlike obstruction of justice, *see McCall*, 2024 WL 4416888, at *3, "Maryland law has also long recognized civil conspiracy as a basis for tort liability," *Mackey v. Compass Mktg., Inc.*, 892 A.2d 479, 494 (Md. 2006). As such, the claim will not be dismissed on that basis.

However, "[u]nder Maryland law, 'civil conspiracy is not recognized as a separate cause of action;' instead it 'provides a means of holding a co-conspirator liable for the acts committed in furtherance of the conspiracy by another member.'" *McDaniel v. Maryland*, Civ. No. RDB-10-00189, 2010 WL 3260007, at *11 (D. Md. Aug. 18, 2010) (first quoting *Woods v. Stewart Title Guar. Co.*, Civ. No. CCB-06-0705, 2006 WL 2135518, at *11–12 (D. Md. July 28, 2006); and then citing *Hovatter v. Widdowson*, Civ. No. CCB-03-2904, 2004 WL 2075467, at *33 (D. Md. Sept. 15, 2004)); *see also Middleton v. Baltimore City Police Dep't*, Civ. No. ELH-20-3536, 2022 WL 268765, at *21 (D. Md. Jan. 28, 2022) ("Maryland 'civil conspiracy is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff.' . . . Accordingly, a plaintiff must allege that she was injured by an overt act done in furtherance of the conspiracy." (internal quotation marks and citations omitted)). The Court consequently does not recognize Count VII as asserting an independent cause of action, but Plaintiff may nonetheless rely upon this theory to extend liability to the alleged conspiring officers under his other surviving state law tort claims.[19] Because the Plaintiff's state law tort claims related to the December 21, 2020 incident survive, this basis for liability against Defendants Vinci,

---

[19] However, to the extent that Plaintiff's civil conspiracy count rests on allegations related to Defendants' purported cover-up following the December 21, 2020 incident, the Court notes that, unlike the alleged conspiracy with respect to the assault and battery, Plaintiff does not make clear what underlying tortious conduct would provide the basis for a civil conspiracy theory of liability with respect to the cover-up.

Spence, Yoder, Koelker, Gilpin, Crites, and Smith may survive as well. *See Largie v. Gerres*, Civ.

No. WDQ-11-2765, 2012 WL 1965450, at *6 (D. Md. May 30, 2012) (finding that plaintiff "stated

a claim for civil conspiracy" where plaintiff had alleged separate counts of tortious conduct and

averred facts giving rise to the inference that defendants "were acting together understandingly"

(quoting *W. Md. Dairy v. Chenowith*, 23 A.2d 660, 664 (Md. 1942)).

Defendants argue in reply that Plaintiff nevertheless fails to allege civil conspiracy because

the operative complaint "is devoid of any allegations to suggest a meeting of the minds between

Defendants Vinci, Spence, Yoder, or Koelker in support of his claim for civil conspiracy." ECF

106, at 5. They also argue that "[b]ecause Plaintiff has failed to state a claim for the substantive

torts alleged against Defendants Vinci, Spence, Yoder, and Koelker, the claims for civil conspiracy

also must fail." *Id.* at 6.

"Under Maryland law, civil conspiracy is defined as the 'combination of two or more

persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means

to accomplish an act not in itself illegal, with the further requirement that the act or the means

employed must result in damages to the plaintiff.'" *Marshall v. James B. Nutter & Co.*, 758 F.3d

537, 541 (4th Cir. 2014) (quoting *Hoffman v. Stamper*, 867 A.2d 276, 290 (Md. 2005)). "In

addition to proving an agreement, 'the plaintiff must also prove the commission of an overt act, in

furtherance of the agreement, that caused the plaintiff to suffer actual injury.'" *Id.* (quoting

*Hoffman*, 867 A.2d at 290). "Thus, civil conspiracy requires an agreement, and an overt act in

furtherance of the agreed-to unlawful conduct that causes injury, as well as the legal capacity of

the conspirators to complete the unlawful conduct." *Id.* "[I]t is well established that 'a conspiracy

may be proved by circumstantial evidence, for in most cases it would be practically impossible to

prove a conspiracy by means of direct evidence alone.'" *Aarow Elec. Sols. v. Tricore Sys., LLC*,

693 F. Supp. 3d 525, 542 (D. Md. 2023) (quoting *Hoffman*, 867 A.2d at 291). "Specifically, 'a conspiracy may be established by inference from the nature of the acts complained of, the individual and collective interest of the alleged conspirators, the situation and relation of the parties at the time of the commission of the acts, the motives which produced them, and all the surrounding circumstances preceding and attending the culmination of the common design.'" *Id.*

The second amended complaint asserts, without much detail about the agreement itself, that "Wolford, Rounds, Vinci, Spence, Yoder and Koelker acted together to agree and conspire to unlawfully violate Mr. McCall's rights by taking him to the Medical Room to assault and commit battery against him on December 21, 2020." ECF 54, at 44 ¶ 179. Plaintiff also alleges specific actions Officer Defendants took together to facilitate the assault. ECF 54, at 14–16 ¶¶ 39–49. Although a "complaint must offer 'more than labels and conclusions,'" *Swaso*, 698 F. App'x at 747 (quoting *Twombly*, 550 U.S. at 555), "on a motion to dismiss [the Court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim," *Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*, 892 F.3d 613, 620 (4th Cir. 2018). Moreover, "it is well established that 'a conspiracy may be proved by circumstantial evidence, for in most cases it would be practically impossible to prove a conspiracy by means of direct evidence alone.'" *Aarow Elec. Sols.*, 693 F. Supp. 3d at 542 (quoting *Hoffman*, 867 A.2d at 291). Thus, the Court concludes that Plaintiff's civil conspiracy theory can proceed against the Officer Defendants.

### 4.    Counts VIII and IX (Excessive Force)

Count VIII of the second amended complaint makes out an Eighth Amendment Excessive force claim under § 1983 against Defendants Mallery, Sherbin, and Hearn based on the allegations related to the October 27, 2023 incident. ECF 54, at 46. Count IX alleges a parallel excessive force claim under Article 25 of the Maryland Declaration of Rights against the same Defendants. ECF 54, at 47. As noted above, the "Eighth Amendment protects against the infliction of 'cruel

33

and unusual punishments.'" *Stanley v. Hejirika*, 134 F.3d 629, 633 (4th Cir. 1998) (quoting U.S. Const. amend. VIII). "This protection, enforced against the states through the Fourteenth Amendment, protects inmates against the application of excessive force by correctional officers." *Id.* at 633–34 (citing *Whitley v. Albers*, 475 U.S. 312, 318–19 (1986)). However, "[n]ot every unpleasant action taken by prison officials against inmates . . . violates the Eighth Amendment." *Id.* at 634. "After incarceration, only the unnecessary and wanton infliction of pain constitutes . . . cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley*, 475 U.S. at 319.

"To prove a claim that prison officials violated his constitutional rights through the excessive use of force, an inmate must satisfy two requirements." *Stanley*, 134 F.3d at 634. "First, he must satisfy a subjective requirement that the force used by the corrections officers 'inflicted unnecessary and wanton pain and suffering.'" *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1993)). "In the context of a prison disturbance, this question 'ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Id.* (quoting *Hudson*, 503 U.S. at 6). "In addition to satisfying the subjective requirement, the inmate must also satisfy an objective requirement; he must show that correctional officers' actions, taken contextually, were 'objectively harmful enough' to offend 'contemporary standards of decency.'" *Id.* (quoting *Hudson*, 503 U.S. at 8). "The objective component measures the nature of the force employed, asking whether that force "was sufficiently serious to establish a cause of action.'" *Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021) (quoting *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019)). However, "[t]his is not a high bar; de minimis or trivial force is not enough, but anything more will suffice." *Id.*

"The use of tear gas against inmates in their cells is not per se a cruel and unusual punishment." *McCargo v. Mister*, 462 F. Supp. 813, 818 (D. Md. 1978). However, "[i]t is

generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996)); *see also Williams*, 77 F.3d at 763 ("[A]lthough it is not *per se* unconstitutional for guards to spray mace at prisoners confined in their cells, it is necessary to examine the 'totality of the circumstances, including the provocation, the amount of gas used, and the purposes for which the gas is used [to] determin[e] the validity of the use of tear gas in the prison environment.'" (quoting *Bailey v. Turner*, 736 F.2d 963, 969 (4th Cir. 1984)).

Officer Defendants argue that, as a matter of law, the October 27, 2023 pepper spray incident does not rise to satisfy the subjective prong of an Eighth Amendment excessive force claim. *See* ECF 97-1, at 17–18. They point to the fact that Plaintiff admits that Defendants' use of force on October 27 was in response to Plaintiff's protest—placing a sheet in the cell slot of his cell door—which created "a threat to the safety of staff and incarcerated individuals on the tier." *Id.* at 17. Moreover, Officer Defendants contend that the operative complaint fails to satisfy the objective prong of the test because Plaintiff "alleges that each officer deployed pepper spray one time, not in a quantity arguably greater than necessary." *Id.* at 18.

Plaintiff takes issue with the Officer Defendants' characterization of the allegations related to the October 27, 2023 incident. In relevant part, Plaintiff points to the allegations that after "Defendants Sherbin and Hearn simultaneously sprayed pepper spray through the cell slot," the officers "closed the cell slot" and "Defendant Mallery then went to the outside of the building and, without provocation or justification, sprayed more pepper spray into [Plaintiff's] cell." ECF 54, at 31 ¶ 103. Mallery, Sherbin, and Hearn then allegedly left Plaintiff "inside the cell for a total of

eight minutes and 20 seconds . . . before they" ultimately "handcuffed him, and removed him from his cell." *Id.*

Taking all facts and inferences flowing therefrom as true, the Court concludes that Plaintiff has stated a claim for excessive force under the Eighth Amendment and Article 25 as it relates to this incident. Although the allegations of pepper spray use may initially have been in response to Plaintiff's act of protest, Plaintiff additionally alleges that Mallery "went to the outside of the building and . . . sprayed more pepper spray into [Plaintiff's] cell after the cell slot door had been closed" and the protest quelled. ECF 54, at 31 ¶ 103. Moreover, Plaintiff alleges that he was left in his cell with the door closed for several minutes after the spray was dispersed despite the fact that he was ultimately handcuffed and removed from the cell. *Id.* Those allegations are enough for Counts VIII and IX to survive the Officer Defendants' motion to dismiss. *Cf Germain v. Gilpin*, Civ. No. TDC-18-0846, 2019 WL 1433019, at *5–6 (D. Md. Mar. 29, 2019) (finding that the plaintiff "stated a valid Eighth Amendment claim for excessive force relating to the use of pepper spray" where although the plaintiff initially resisted an officer's grabbing of his arm through the feed slot, the officer defendants used more pepper spray after the slot was closed).

### 5.    Count X (Retaliation)

Count X of the second amended complaint alleges a retaliation claim in violation of Article 19 of the Maryland Constitution against Defendants Puffenbarger, Mallery, Sherbin, and Hearn. Specifically, Plaintiff alleges that, in connection with the April 26, 2023 incident, "Defendant Puffenbarger retaliated against [Plaintiff] because [Plaintiff] had filed a lawsuit against the NBCI Defendants, because [Plaintiff] filed a written grievance against Defendant Puffenbarger, or because [Plaintiff] had filed both a civil lawsuit against the NBCI Defendants and a written grievance against Defendant Puffenbarger." ECF 54, at 48 ¶ 201. Additionally, Plaintiff claims that, "as a result of his previous grievances and complaints concerning Defendant Puffenbarger's

36

failure to protect him from harm," "Defendants Mallery, Sherbin, and Hearn maliciously and without justification pepper sprayed him in his cell in retaliation." *Id.* at 49 ¶ 203.

The Officer Defendants contend that "[a]n incarcerated individual cannot just assert a generalized retaliatory animus but must allege facts that support a claim of retaliation." ECF 97-1, at 19. They argue that Plaintiff has not alleged "some adverse impact from the alleged retaliation to his ability to exercise his protected right" and that there is no other "legitimate reason" for the alleged retaliatory action. *Id.* (first citing *ACLU of Md., Inc. v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993); and then citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Moreover, Officer Defendants contend that Plaintiff "fails to adequately plead a causal connection between Plaintiff's administrative grievances and the pepper-spray incident at WCI." *Id.* at 20. Plaintiff responds that he has sufficiently alleged the timing and content of his ARPs, letter, and other complaints, including this lawsuit, as well as "direct evidence of correctional officers acknowledging the existence of these complaints." ECF 101, at 42–43.

"A plaintiff alleging that government officials retaliated against [him] in violation of [his] constitutional rights must demonstrate, *inter alia*, that [he] suffered some adversity in response to h[is] exercise of protected rights." *Id.* (citing *Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir.1990)). "In the prison context, we treat [retaliation] claims with skepticism because '[e]very act of discipline by prison officials is by definition "retaliatory" in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (citing *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)).

Plaintiff argues that the Court should find that Plaintiff stated a successful claim for First Amendment retaliation. ECF 101, at 41–44. Even assuming Plaintiff has alleged a First

Amendment retaliation claim,[20] the Court disagrees. "The First Amendment protects the right to petition the Government for a redress of grievances, and the Supreme Court has recognized that prisoners retain this constitutional right while they are incarcerated." *Shaw v. Foreman*, 59 F.4th 121, 130 (4th Cir. 2023) (quoting *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017)). "To state a colorable First Amendment retaliation claim, a plaintiff must allege that (1) he engaged in protected First Amendment activity, (2) the defendant[s] took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant[s'] conduct." *Id.* (internal quotation marks and citation omitted). "To demonstrate a causal relationship between protected activity and the defendants' conduct, this Court applies the burden-shifting framework of the same-decision test." *Id.* at 130. "For a plaintiff to meet his prima facie burden of causation, he must show '(1) that the defendant[s were] aware of [his] engaging in protected activity' and (2) 'some degree of temporal proximity to suggest a causal connection.'" *Id.* at 130–31 (*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005)).

With respect to Puffenbarger, Plaintiff does allege "some degree of temporal proximity" between the April 6, 2023 stabbing incident and the protected conduct, namely his meeting with Puffenbarger on March 2, 2023 and the filing of a related grievance shortly thereafter. *Shaw*, 59 F.4th at 130–31; ECF 54, at 27–28 ¶¶ 89–93. But even assuming the complaint Plaintiff made at their meeting constitutes protected First Amendment activity, or that Puffenbarger was aware of

---

[20] The second amended complaint describes Count X as one alleging retaliation under Article 19 of the Maryland Declaration of Rights but makes reference to the First Amendment. ECF 54, at 48. Article 19 states that "every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the Land." Md. Const. Decl. of Rts. art. 19. Neither party addresses how Article 19 gives rise to Plaintiff's claim of retaliation in this case.

other ARPs and Plaintiff's lawsuit, Plaintiff has failed to allege that Puffenbarger "took some action that adversely affected [Plaintiff's] First Amendment rights." *Martin*, 858 F.3d at 249. And with respect to Mallery, Sherbin, and Hearn, Plaintiff fails to allege any knowledge on the part of those Defendants of Plaintiff's ARPs that were filed leading up to the incident. A general history of protected activity, without any temporal connection to the alleged retaliatory conduct—which Plaintiff also alleges was carried out in response to Plaintiff grabbing Mallery's arm, *see* ECF 54, at 31—does not give rise to a plausible inference of causation. Accordingly, Count X of the second amended complaint must be dismissed.

### 6.    Count XI (Battery)

In Count XI of the operative complaint, Plaintiff asserts a state law battery claim against Defendants Mallery, Sherbin, and Hearn. ECF 54, at 49. "Under Maryland law, a battery is an offensive, non-consensual touching—the unlawful application of force to the person of another." *Jones v. Fam. Health Ctrs. of Balt., Inc.*, 135 F. Supp. 3d 372, 384 (D. Md. 2015) (internal quotation marks and citations omitted). "The intent element of battery requires not a specific desire to bring about a certain result, but rather a general intent to unlawfully invade another's physical well-being through a harmful or offensive contact or an apprehension of such a contact." *Nelson v. Carroll*, 735 A.2d 1096, 1101 (Md. 1999). Additionally, "when defendants have legal justification for their actions, a claim for battery cannot advance." *Wallace v. Poulos*, 861 F. Supp. 2d 587, 597 (D. Md. 2012) (citing *Hines v. French*, 852 A.2d 1047, 1055–56 (Md. App. 2004)).

Officer Defendants argue that Plaintiff has not alleged any "intent to unlawfully invade Plaintiff's well-being." ECF 97-1, at 21. Additionally, they assert that the officers had "legal justification in their actions" because "each officer deployed pepper spray once" in response to "Plaintiff's admitted protest." *Id.* Plaintiff responds that the allegations related to the October 27, 2023 incident clearly show such an intent. ECF 101, at 45–46. The second amended complaint

avers that Mallery, Sherbin, and Hearn's actions were intentional and undertaken without Plaintiff's consent. Moreover, as explored above, at this stage of litigation, Plaintiff has plausibly alleged that there was no legal justification for their conduct. Thus, Plaintiff has plausibly pleaded the prima facie elements of battery, and Count XI survives Officer Defendants' motion to dismiss.

## IV.    CONCLUSION

For the foregoing reasons, Defendants Rounds, Wolford, AW Butler, Warden Weber, and Commissioner Morgan's motion to dismiss, ECF 67, is granted. Counts XII and XIII of the second amended complaint do not survive as to AW Butler, Warden Weber, and Commissioner Morgan, and they will be dismissed from this action. However, Counts XII and XIII survive as to Puffenbarger. Defendants Koelker, Vinci, Yoder, Crites, Gilpin, Puffenbarger, Sherbin, Hearn, Mallery, Smith, and Spence's motion to dismiss, ECF 97, is granted in part and denied in part. Count X is dismissed, and all other counts survive with respect to those Defendants.

A separate implementing Order will issue.

Dated: September 29, 2025

_____/s/_____
Brendan A. Hurson
United States District Judge